[Civ. No. 18415. First Dist., Div. One. Jan. 13, 1960.]

GEORGE LEE CARRICO et al., Appellants, v. CITY AND COUNTY OF SAN FRANCISCO, Respondent.

Reginald G. Hearn for Appellants.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, for Respondent.

TOBRINER, J.—Appellant general contractors predicate this appeal on the lack of substantial evidence in the record to support three portions of the findings and judgment in favor of respondent city and county of San Francisco: (1) appellants improperly constructed certain roofs to respondent's damage in the sum of $17,923.64; (2) respondent properly delayed acceptance of, and final payment for, the buildings because of appellants' contractual failures; and (3) con-

tract modification number 23, providing for installation of the skylights, entitled appellants only to payment for labor and materials, excluding both shop overhead incurred by the subcontractor and also overhead and profit of the general contractors. As we shall explain, we have found the judgment properly supported by the evidence in all respects except that the general contractors should recover the entire amount billed them by the subcontractor, inclusive of the subcontractor's shop overhead.

The instant dispute is the deformed issue of a contract for the construction of four identical recreation centers in San Francisco: Potrero Hill, Ocean View, St. Mary's and Sunset. On October 24, 1949, appellants contracted to construct these centers, the work to be "entirely completed" within 365 days. Respondent in turn agreed to make progress payments equal to 90 per cent of the work done, the balance to be paid after the Recreation Department's engineer had found that the work had been "fully and satisfactorily completed" and the Recreation "Commission ha[d], by resolution, accepted the work." The contract imposed upon appellants the duty of protecting and safeguarding the work, "from any" cause, until acceptance by respondent. The contract also provided that the respondent city and county could take "possession of" the recreation centers and "open [them] for public use" without such "constituting acceptance of the work or any part thereof." Appellants commenced work in October or November of 1949, and by December, 1950, had completed 95 per cent of the work and received progress payments accordingly.

The skylights, which had been installed pursuant to the plans and specifications, leaked. On January 26, 1951, the parties modified the contract to provide for a complete reworking of the skylights, such work, according to modification number 23, to be done on a "time and material" basis. Appellants completed the reconstruction of the skylights, which differed from the original plans, "[s]ometime during the month of February or early March, 1951. . . ."

By May 25, 1951, the city took possession of the recreation centers for its "custodial care." In January, 1952, the city finally accepted the buildings, respondent making the retention payment of $85,000 to appellants on February 29, 1952. The parties left for future settlement the payment pertaining to modification number 23.

After a trial without jury the court rendered the following findings, among others: (1) that throughout "the year 1951,

and until January 24, 1952,'' the refusal of respondent to make final payment to appellants and formally to accept the work done under the contract ''was due to non-compliance by [appellants] . . . with the 'check list' or 'punch list' demands'' of respondent, which lists contained demands by respondent that appellants correct work not done in conformity with the contract, and failure to supply respondent with proper specifications in the bill for work under contract modification number 23; (2) that contract modification number 23, entitling appellants to their cost for ''time and material,'' did not include provision for overhead and profit but only for cost of labor and material, which amounted to $4,801.81; and (3) that appellants defectively constructed the ''fieldhouse roof on each recreation center,'' causing respondent damage in the amount of $4,231 with respect to each roof. The court entered judgment on September 17, 1957, which: (1) awarded appellants $4,801.81, (2) awarded respondent $17,923.60, and (3) denied appellants' other claims against respondent.

Appellants attack the sufficiency of the evidence to support the findings and judgment. We turn to an examination of the evidence for support of the findings.

*First, was appellants' failure to properly construct the fieldhouse roofs sufficiently established?*

 The plans and drawings for the construction of the fieldhouse roofs call for a pitch of one-eighth inch per foot which was to be achieved by use of light weight concrete fill. This fill was to be placed on top of the structural concrete slab. City Assistant Engineer Downey, a graduate civil engineer, testified that he inspected the roofs on the fieldhouses at each of the centers, and ''that where these roofs are flat roofs they have not pitched them by the installation of this light weight aggregate to carry the respective drains. [E]very place where we have a level roof they [appellants] haven't done the work which would drain the water off to the various drains, and that's what we call by the filler or installing the light weight aggregate that would create the slope . . . and that's what the architect intended. . . .'' Downey also stated that in ''pouring this construction slab you . . . get highs and lows. . . .'' Moreover, the architect who prepared the plans and drawings testified if the one-eighth inch per foot were uniform, such uniformity would be sufficient for drainage purposes under ordinary circumstances. Finally, respondent's Exhibit Six, prepared by Mr. Corollo, one of its inspectors, contained a showing of the pitch for the fieldhouse roofs at

numerous points, per plans, and appellants' deviations therefrom at the Ocean View and Sunset Recreation Centers.

While appellants' expert witness, structural engineer Robinson, testified that the plastic flow of concrete in the roofs in question could be up to one-half inch, Corollo in turn stated that 50 per cent of this plastic flow takes place within the first two and one-half months. Furthermore, Robinson admitted that "if you screeded your fill material to an accurate grade after your forms had been stripped for quite a while [from the concrete slab] . . . you would definitely improve the accuracy of your surface by using a fill material."

As to the cost of conforming the roof construction to the plans, General Manager Collins of C. J. Collins, general contractor, after reviewing the plans and specifications, estimated that this would be $16,924 the figure being based on the cost of removing the asphalt and gravel from the roofs and installing the light weight aggregate.

In light of the foregoing testimony appellants' claim that the evidence is insufficient to support the judgment cannot stand. Creager's testimony that appellants installed the required pitch in the concrete slab is refuted by the specific measurements of the Ocean View and Sunset roofs. Lastly, the trial court's rejection of appellants' contention that they were given permission to place the pitch in the concrete slab is supported both by Harman's testimony and the contract itself.

While the evidence as to the defective roofs of Potrero Hill and St. Mary's is not as explicit as that regarding the roofs at Ocean View and Sunset, the court could properly conclude that appellants' attempt to place the pitch in the concrete slab did not afford respondent the protection for which it had contracted. The testimony as to the plastic flow of concrete, the better uniformity obtained by use of fill materials and appellants' admitted omission to conform to the plans supports the award, which insured that all the fieldhouse roofs would actually be constructed in such fashion as to fulfill the original directions.

*Second, is there substantial evidence to support the finding that appellants throughout the year 1951 had not fully completed their contract and respondent properly delayed acceptance of, and payment for, the buildings?*

First, defendant's Exhibit Five contains numerous communications to appellants requesting correction of defectively performed work. Indeed, a "check list" pertaining to

Ocean View "as of 11:00 a.m., May 22, 1951" specifies the following item: "Roof above lobby—field house—rain water does not drain to roof drain but runs over edge of roof. Build up roof areas as necessary to direct rain to roof drain."

Second, the city's supervising engineer Harman testified that while the recreation commission is the authoritative body with respect to construction projects on matters "incident to . . . payment," the recreation commission normally follows his recommendations, and that he recommended refusal of the release of the 10 per cent retention because of noncompliance by appellants with the plans and specifications pertaining to various items, one of which was the adequacy of the fieldhouse roofs.

Third, the previous analysis of appellants' first claim indicates such deficiency had not been corrected even at the time of the suit. Corollo testified that in January, 1951, the floor at Potrero Hill was not even one-fourth completed, and that on March 27, 1951, appellants were still working on it. While Gautier claimed that the floors were not finished by December 13, 1950, because of leaking skylights, and that this defect resulted from faulty design, modification number 23 specifically states that "this work must be installed before buildings can be completed." Since appellants performed the work on the skylights in or about March, 1951, they cannot properly claim an $85,000 payment prior to that time. As respondent points out, appellants' allegation that respondent's final acceptance in February, 1952, came 442 days late conflicts with appellant Carrico's verified answer that any damages to the buildings resulted from respondent's taking custody and use thereof by May 25, 1951, "prior to completion upon the part of cross-defendants . . . ."

In the light of these facts, we need not discuss the trial court's finding that respondent was entitled to withhold the $85,000 by virtue of appellants' failure, pursuant to modification number 23, to itemize its bill of $7,900 for the work performed.

We turn to appellants' defense that respondent is estopped to assert defective workmanship as a ground for refusal of acceptance and of payment. Appellants do not make clear whether they rest the estoppel upon respondent's custodial or final acceptance. In either event their claim is not supported by the facts or by their citation of *Fox-Woodsum Co.* v. *Fidelity etc. Co.* (1920), 45 Cal.App. 569 [188 P. 70]. That case merely held that formal acceptance of cer-

tain schools by the school district constituted the completion of the contract within a statute which imposed a condition precedent to suit by a materialman. The statute read " 'any materialman . . . whose claim has not been paid by the contractor . . . shall, within ninety days *from the time such contract is completed,* file with the . . . body by whom such contract was awarded, . . . a statement that [his claim has] . . . not been paid.' " (P. 570.) In the instant case the contract, first, specifically provides that the respondent could take possession of the buildings without such taking constituting acceptance, and, second, contemplates the correction of defective workmanship, after acceptance, by the requirement that appellants post a bond covering the work for a period of one year after such acceptance.

*Third, did modification number 23 entitle appellants to allowance for the subcontractor's charge for "shop overhead" and for their own overhead and profit?*

 The language of contract modification number 23 providing that skylights be reworked on a "time and material basis . . . total cost not to exceed $1,975.00 for each of four units" raises the question whether those terms include recovery for overhead or profit. Since, as respondent knew in advance, the work necessarily involved the use of a subcontractor, the question, in turn, subdivides into whether, first, the subcontractor and, second, the general contractors should obtain recovery.

The trial court denied recovery to the general contractors of the amount which they were obligated to pay to the subcontractor for "shop overhead," and it likewise denied to the general contractors any allowance for recovery of their own overhead or profit. The subcontractor billed the general contractors the sum of $6,459.04, which reflected its labor, material and shop overhead. Although appellant general contractors' own "supervision charge," added to this amount, would have brought the total figure to $8,200, appellants billed the city for $7,900 because the modification order fixed the maximum amount at this latter figure. The trial court awarded appellants $4,801.81 apparently upon the theory that the overhead costs of the subcontractor, which is computed at 25.6 per cent should be deducted from the bill and that the general contractors should not obtain any recovery for their overhead or profit.

Turning first to the problem as to the overhead of the subcontractor, we read the terms "time and material" in

the circumstances that: (1) respondent knew the general contractors would be required to utilize the subcontractor to do the specialty work of the installation of the skylights; (2) the supervision of the work by the subcontractor was both necessary and unquestioned; (3) the subcontractor actually paid for "time" worked in such supervision; and (4) the subcontractor excluded any charge for profit. If respondent escapes paying for the subcontractor's overhead and supervision costs, it becomes the nonpaying beneficiary of supervisory work for which the general contractors are obligated to pay. While we realize that the doubtful equities of this result do not necessarily compel an interpretation of the contract contrary to the parties' intent, we do not believe that the parties intended any such result.

The terms "time and material" must include the cost of the installation of the materials by the subcontractor. If the general contractor were to purchase material for direct installation, it would necessarily pay the overhead costs included in the price. The parties surely did not intend that the general contractors should excise the subcontractor's overhead cost reflected in the price of material. They harbored no different intent when the general contractors engaged the subcontractor for the whole job of installation, contracting not only for the materials but also for the time involved in placing the materials upon the job. To allow the overhead cost in the price of the materials but to deny it in the price of installation is to abrogate the normal procedure and intent of those engaged in the construction industry.

Moreover, it would be a harsh rule that would deny reimbursement to the general contractors for the compensation paid by the subcontractor to a superintendent whose services were admittedly required and rendered. "Time" in "time and material" must mean time worked. The superintendent's hours of work are as much time worked as the apprentice's or the journeyman's. To conceive that the parties meant to include the latter and exclude the former is to concoct an unlikely distinction.

The decisions in California, as we shall show, do not rule upon the precise point; decisions elsewhere support the reasoning stated above.

The case most apposite is an early New York decision, whose authority has never, to our knowledge, been questioned. In *Hamilton* v. *Coogan* (1894), 7 Misc. 677 [28 N.Y.S. 21], the general contractor "agreed to erect a building" for

" 'the cost of labor and material used therein, and 10 per cent. added thereto as profit.' " When, however, he submitted the bill, the defendant builder resisted "upon the ground that the bills of the subcontractors include the profits of the latter in addition to the cost of the labor and materials furnished by them respectively." Posing "the question for our determination" as "whether the plaintiffs shall be allowed the amount of these subcontracts as 'the cost of labor and material,' " (p. 21) the court concluded, "It is more reasonable to conclude that what the parties intended by the cost of labor and material was the actual charge of the several contracting mechanics for the portion of the work done by each, and his profit upon what he paid his workmen, and the price of the material they used, as it represented the necessary expenses of supervision and skill in directing and performing the work in a workmanlike manner, and the maintenance of facilities for the proper performance of his contract." (P. 22.) (To the same effect: 17 C.J.S. Contracts, § 367, p. 824.)

The case of *Advance Auto Body Wks. Inc.* v. *Asbury Transp. Co.* (1935), 10 Cal.App.2d 619 [52 P.2d 958], upon which the trial court probably relied, did not involve the situation of a subcontractor and therefore does not really resolve our problem. As we shall point out, the general contractor who uses these terms may well intend to restrict himself to charges only for time and materials, exclusive of overhead, but it is another matter to conclude that he meant to extract the subcontractor's overhead from his rendered charges.

While the second and more recent California case of *Vowels* v. *Witt* (1957), 149 Cal.App.2d 257 [308 P.2d 415], considers the argument that "under the contract respondent [contractor] should be allowed to recover only the costs of labor and material furnished by subcontractors, but not the profit made by such subcontractors" (pp. 262-263), the opinion deals with the meaning of the term "costs" rather than "time and material." One paragraph of the contract defined "costs" as " 'costs *and profits* of any subcontractors engaged by the contractor.' " (P. 263.) As a result, the court allowed the recovery of the subcontractor's profits.

If, then, we conclude that the general contractor should recover the amount of $6,459.04 which the subcontractor billed, inclusive of "shop overhead," we face the question

whether the court erred in denying the general contractors any recovery for their own overhead or profit.

As to the general, as distinguished from the subcontractor, the parties in this situation used the term "time and material" in a different context and circumstances. These were special terms which the general contractors, themselves, wrote into the contract, omitting the frequent additional usage of the words "plus" a stated "profit." The trial court obviously concluded that it should not inject into these restricted terms, which omit provision for profit or overhead, such additional costs.

The language of *Advance Auto Body Wks. Inc.* v. *Asbury Transp. Co., supra* (1935), 10 Cal.App.2d 619, in which the parties substitued "time and material" for "cost" applies: "By the change in phraseology, it is apparent that appellant attempted to more definitely restrict the charges for which it would be liable, and to avoid liability for any overhead charges. The overhead expense should not have been included in the computation of the charge to be made under the contract." (P. 620.) The quotation in that case from *Lytle, Campbell & Co.* v. *Somers, Fitler & Todd Co.* (1923), 276 Pa. 409 [120 A. 409, 27 A.L.R. 41], is particularly pertinent: ". . . unless expressly written into the contract by defining exactly the overhead intended to be covered, the words 'time and material', and like expressions, will not include overhead charges. . . ." (Idem.)

While the extrastate decisions are by no means uniform, the weight of authority apparently denies the general contractor the right to charge any overhead or profit upon the subcontractor's work in the case of a contract providing for "time and material." (*Lytle, Campbell & Co.* v. *Somers, Fitler & Todd Co.* (1923), *supra*, 276 Pa. 409 [120 A. 409, 27 A.L.R. 41]; *Dougherty* v. *Iredale* (1952), 91 Ohio App. 485, 487 [108 N.E.2d 754].) On the other hand, in a cost plus contract such items have been allowed (*Thoroughbred Motor Court* v. *Allen Co.* (1956), (Ky.App.), 296 S.W.2d 690, 693; *Ford & Butterfield* v. *St. L., K. & N.W.R. Co.* (1880), 54 Iowa 723 [7 N.W. 126]) and partially (*Grafton Hotel Co.* v. *Walsh* (C.C.A. 4th, 1915), 228 F. 5 [142 C.C.A. 461]) or completely disallowed (*Parks & Co.* v. *Howard Hotel Realty Co.* (1925), 200 Iowa 479 [203 N.W. 247]).

In the instant case, the terms "time and material" are not only definitive in themselves, but as the record shows, were used under special circumstances. Modification number

called for extra work not originally planned, and there was an evident disposition of all parties to hold the added costs to the minimum. While such an intent did not necessarily reach to the extent that the general contractor assume an out-of-pocket loss for payment of the subcontractor's "shop overhead," it may well have excluded the general contractors' own overhead and profit.

We conclude that although the general contractors here were not entitled to overhead or profit, they should be allowed the full amount of the charge of the subcontractor including the item of shop overhead. Since the record discloses that the parties did not question the accuracy of the amounts involved, it is unnecessary that the case be retried. It will suffice to modify the award to the appellants which the court rendered in the amount of $4,801.81 to the amount of $6,459.04, the amount billed by the subcontractor.

The amount awarded to appellants is modified from $4,801.81 to $6,459.04. In all other respects we affirm the judgment. Each party shall bear its own costs on appeal.

Bray, P. J., and Duniway, J., concurred.

A petition for a rehearing was denied February 9, 1960.